**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JEFFERY LORENZO HAYNES, JR.,

       Plaintiff,

                                Case No. 3:23-cv-698-MMH-MCR

vs.

SGT. C. BURNHAM, et al.,

       Defendants.

                                    /

**O R D E R**

**I.  Status**

Plaintiff Jeffery Lorenzo Haynes, Jr., while an inmate of the Florida Department of Corrections (FDOC), initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983.  He is proceeding on an Amended Complaint (Doc. 5; Am. Compl.).  Haynes names three Defendants: (1) Sergeant C. Burnham, (2) Officer T. Lister, and (3) Officer E. Miller.  Id. at 2-3.

At this time, Haynes's sole remaining claims are excessive force and failure to intervene under the Eighth Amendment.[1]

This matter is before the Court on Defendant's [sic] Motion for Summary Judgment (Doc. 48; Motion), with exhibits (Docs. 48-1 to 48-6, and Doc. 50), filed on August 4, 2025. The Court advised Haynes of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him to respond to the Motion. See Order (Doc. 14); Summary Judgment Notice (Doc. 49). Haynes filed a response in opposition to the Motion (Doc. 51; Response) on August 18, 2025.[2] The Motion is ripe for review.

---

[1] In his Amended Complaint, Haynes also asserted that Defendants violated the Americans with Disabilities Act (ADA). See Am. Compl. at 7. On December 6, 2024, the Court granted Defendants' request for dismissal of the ADA claim finding that Haynes failed to state a plausible claim for relief under the ADA. See Order (Doc. 31) at 15-17.

[2] The Court notes that on September 18, 2025, an individual identifying herself as Haynes's half-sister filed an affidavit along with several lengthy exhibits related to the use of force incident at issue in this case. See Affidavit of Complainant (Doc. 54). To the extent these documents are offered in support of the Response, they are due to be stricken because they are untimely filed and were improperly submitted by a non-party to this case. See Local Rule 3.01(d) (setting deadline to respond to a motion for summary judgment); see also Fed. R. Civ. P. 11(a) (requiring every "pleading, written motion, and other paper" to be signed by "a party personally if the party is unrepresented"). Regardless, the Court has reviewed the documents, and they would not impact the outcome of the instant Motion.

## II. <u>Haynes's Allegations</u>[3]

In his Amended Complaint, Haynes alleges that on May 16, 2019, while housed at Hamilton Correctional Institution (Hamilton C.I.), Defendants Burnham, Lister, and Miller came into his cell and threatened Haynes that he must "drop the case against Martin C[orrectional] I[nstitution] or they will have him killed." Am. Compl. at 5. Haynes states that he asked Defendants to leave his cell, but Defendant Burnham sprayed a chemical agent at Haynes's face "without provocation." <u>Id.</u> Haynes also states Defendant Miller "punch[ed] him to the ground," triggering Haynes's attempt to "run out of the cell." <u>Id.</u> However, he was "slammed inside his cell" and "blood [was] gushing from his head." <u>Id.</u> Haynes states Defendants handcuffed him, and while he was handcuffed, Defendants "kick[ed], punch[ed], and struck [him] with weapons." <u>Id.</u> at 6. While Haynes asserts he did not "resist or threaten" Defendants during this event, <u>see</u> <u>id.</u>, he received a disciplinary report for battery or attempted battery on correctional staff for the May 16, 2019 incident and was found guilty, <u>see</u> <u>id.</u> at 7, 8. Haynes also alleges that during the disciplinary hearing, he asked the disciplinary team to locate and call inmates who witnessed the incident, but

---

[3] The recited facts are drawn from the Amended Complaint.

officials failed to call any witnesses.  Id. at 8.  As a result of Defendants' use of force, Haynes contends he was bleeding from his eye, head, and face, and had "numerous bruises and abrasions to the face and head."  Id.  Haynes states that after the use of force, medical examined him and applied sutures to the right side of his face and "treatment to his head"; but medical staff "denied hospital treatment" and no doctor was present to properly evaluate him for a head injury. Id. at 6, 8, 9.  According to Haynes, he suffers from mental health issues, including bipolar disorder, depression, schizophrenia, and antisocial personality disorder.  Id. at 7.  As relief, he requests compensatory and punitive damages. Id.

### III.   Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

4

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

5

issues of material fact to be determined at trial. <u>See</u> <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." <u>Haves v. City of Miami</u>, 52 F.3d 918, 921 (11th Cir. 1995) (citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV.   Summary of the Parties' Positions

### A. Defendants' Motion & Evidence

In the Motion, Defendants contend that the Court should grant summary judgment in their favor as to Haynes's Eighth Amendment claims against them. They argue that the evidence shows Haynes actively resisted their efforts to restrain him such that they had a need to use force. See Motion at 16, 18. And they maintain that the use of force was proportional to the need. Id. at 18. In addition, Defendants assert that they are entitled to qualified immunity. Id. at 21.

In support of their positions, Defendants rely on Use of Force Incident Reports in which Defendants and other officers describe their version of the encounter with Haynes. See Motion, Ex. 3 (Incident Reports).[5]  The most comprehensive account of the incident is set forth in an Incident Report prepared by Officer Michael Battles. Specifically, Officer Battles details the incident as follows:

> On May 16, 2019, I was assigned as an Internal Security Officer. At approximately 11:33 AM, while present on wing one of G-

---

[5] To the extent Haynes argues that the Court may not rely on these Incident Reports, see Response at 9-10, this argument is rejected as each report is limited to what the officer observed and there is no indication that these officers are unavailable to testify at trial. See Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012); see also Coffman v. Battle, 786 F. App'x 926, 934 (11th Cir. 2019); Joassin v. Murphy, 661 F. App'x 558, 559 (11th Cir. 2016).

7

Dormitory at cell G1-115 with [Defendants Burnham, Lister, and Miller] conducting a wellness check on Inmate Haynes . . . due to him appearing to be under the influence of an unknown substance.

Upon entry into the cell Officer Lister and Sergeant Burnham were assisting Inmate Haynes to his feet to place him in hand restraints. It was at this time Inmate Haynes became physically combative breaking free of the grasps of Sergeant Burnham and Officer Lister by utilizing both his hands [to] push them away then attempting to lunge past me out of the cell door.  To prevent Inmate Haynes from breaching the cell door while being combative Sergeant Burnham and Officer Lister attempted to secure a hold of Inmate Haynes upper torso and upper extremities and force him to the ground chest first to prevent injuries to fellow staff and Inmate Haynes, while giving Inmate Haynes orders to cease his combative behavior, to no avail.

Inmate Haynes continued to be physically combative towards Sergeant Burnham and Officer Lister striking them both with clinched fists in the upper torso area.  I then gave Inmate Haynes several orders to cease his combative behavior and submit to hand restraints or chemical agents would be administered to no avail. Sergeant Burnham and Officer Lister were unable to subdue Inmate Haynes and force him to the ground chest first to be place[d] in hand restraints.  Inmate Haynes continued to lunge towards me in an aggressive manner.

To prevent harm to Myself or fellow staff I retrieved my assigned Sabre Red MK-4 (OC) Chemical Agent canister . . . and administered a continuous stream of chemical agent to upper torso and facial area of Inmate Haynes while giving loud verbal orders to cease his actions lay chest down on floor and submit to hand restraints.  Subsequent to the application of chemical agents, Inmate Haynes continued to be combative towards staff by clinching his fists and violently throwing punches towards staff while lunging towards the door way of the cell.

Inmate Haynes was able to breach the cell door past Myself. I then Observed Officer E. Miller attempt to grasp Inmate Haynes by the

8

upper torso and force him down to the ground chest first to be placed in hand restraints, to no avail. Inmate Haynes continued to be physically combative striking Officer E. Miller with clinched fists in the upper torso and facial area and grasped his shirt in an attempt to evade being placed in wrist restraints. To protect himself and break free of Inmate Haynes grasp Officer Miller struck Inmate Haynes in the upper torso area with clinched fists.

Once Officer E. Miller was free of Inmate Haynes grasp, Myself and Officer E. Miller then utilized Inmate Haynes momentum to force him to the ground.  Once Inmate Haynes was secured on the ground I then initiated (ICS) Incident Command System via my assigned handheld radio, requesting the assistance of additional security staff. Inmate Haynes was then placed into double locked wrist restraints and escorted to H-Dormitory for a decontamination shower. I am trained in the use of Chemical Agent as indicated on my Weapons Cards.

See Motion, Ex. 3 at ECF p. 1-2 (paragraph separation added).

Defendants Miller, Burnham, and Lister also completed Incident Reports and the details set forth in their Reports are consistent with Officer Battles's account.  Id., Ex. 3 at ECF pp. 3-4, 6-9.  Notably, Defendants Burnham and Lister both include in their Incident Reports an additional statement that "Subsequent to Inmate Haynes being placed in restraints I did not witness any further force being utilized."  Id., Ex. 3 at ECF pp. 7, 9.  Two other officers who witnessed the encounter describe a consistent version of the incident in their Incident Reports, including the statement that no force was used after Haynes was placed in restraints.  Id. Ex. 3 at ECF pp. 5, 10.

In addition to the Incident Reports, Defendants rely on the outcome of a disciplinary hearing where Haynes was found guilty of battery or attempted battery on a correctional officer related to the use of force incident at issue in this lawsuit.  See Motion, Ex. 5 (Disciplinary Report).  The basis for the decision as set forth in the Disciplinary Report is as follows:

> Based on the statement of facts where Officer Battles states that on May 16, 2019, at approximately 11:33AM, he was present on wing one of G- Dormitory at Cell G1-115 with Sergeant C. Burnham, Officers T. Lister and E. Miller conducting a wellness check on Inmate Haynes . . . due to him appearing to be under influence of an unknown substance.  Upon entry into the cell Officer Lister and Sergeant Burnham were assisting Inmate Haynes to his feet to place him in hand restraints.  It was at this time Inmate Haynes became physically combative breaking free of the grasps of Sergeant Burnham and Officer Lister by utilizing both his hands to push them away then attempting to lunge out of the cell door.  To prevent Inmate Haynes from breaching the cell door while being combative Sergent Burnham and Officer Lister attempted to secure a hold of inmate Haynes['s] upper torso and upper extremities and force him to the ground chest first to prevent injuries to fellow staff and Inmate Haynes, while giving Inmate Haynes orders to cease his combative behavior, to no avail.  Inmate Haynes continued to be physically combative towards Sergeant Burnham and Officer Lister striking them both with clinched fists in the upper torso area.  Physical and chemical force was utilized to overcome inmate Haynes's physical resistance to a lawful command.

See Motion, Ex. 5 (Disciplinary Report) at 2.

Defendants also submit medical records documenting their injuries from the encounter.  Id., Ex. 4.  Defendant Lister sustained a bruise on his bicep and

10

an abrasion on his hand.  Id., Ex. 4 at 1.  Defendant Burnham had a cut on his finger and palm, and redness on his face, neck, and arms.  Id., Ex. 4 at 3. Defendant Miller had redness on his face, arms, and body, as well as superficial abrasions on his forearm and chest, and "burn" type injuries under his chin.  Id., Ex. 4 at 4-5.  Officer Battles, who was also involved in the incident, had mild swelling near his eye and pain in his right hand.  Id., Ex. 4 at 6-7.

In addition, Defendants provide video evidence related to the incident. See Motion, Ex. 6; see also Doc. 50.[6]  Video One presents a view looking down from the ceiling on one end of the wing.  It shows a long corridor with two floors of cells on each side.  Haynes's cell is located on the bottom left of Video One. The video provides a partial view of his cell door, but due to the camera angle, Haynes and the interior of the cell are not visible.  Starting approximately twenty-five seconds into the video, a group of officers walk down the corridor and approach Haynes's cell.  An inmate, who is not Haynes, walks out of the cell and leaves the area.  One officer, in a green shirt, enters the cell, while three

---

[6] In his Response, Haynes expresses his belief that the video evidence is falsified.  See Response at 12.  This conclusory assertion without any evidence in support is insufficient to create an issue of fact about the accuracy of the videos.  See Haynes v. Volpelletto, No. 23-11063, 2024 WL 1911200, at *6 (11th Cir. May 1, 2024).

male officers and one female officer stand outside the door.[7]  The female officer walks away.  The three male officers stand outside the cell and appear to be calmly observing what is happening inside the cell.

About fifty seconds after Lister enters the cell, the other three officers suddenly rush inside.  Video One does not show what is occurring inside the cell, but officers are shown backing out and then re-entering the cell.  About thirty seconds after the three officers rush into the cell, two officers, who have backed out of the cell, position themselves at the door and appear to be pushing against Haynes to keep him inside.  They are unsuccessful and Haynes lunges out of the cell.  His shirt appears torn and his arms are flailing.  He is not handcuffed.  Haynes's left arm swings toward the face of Defendant Miller and Haynes grabs Miller's shirt.[8]  Miller then punches Haynes in his upper torso or face with his right-hand.  The momentum from the punch moves Haynes and Miller off screen, and another officer follows.

---

[7] The Court cannot ascertain the identities of the officers from the video itself, and Defendants do not provide any evidence specifically identifying the individuals depicted. Nevertheless, in the Motion, defense counsel identifies the officer in the green shirt as Defendant Lister and the Court will refer to him as such. See Motion at 6.

[8] Again, while the officers are not identified on the video, defense counsel represents that this officer is Defendant Miller. See Motion at 6.  Miller is also consistently identified in the Incident Reports as the officer who punched Haynes after Haynes grabbed his shirt. See Motion, Ex. 3.  Haynes also specifically recalls being punched to the ground by Miller. See Response at 2; Am. Compl. ¶ 15.

12

Lister and another officer then exit the cell. Lister stands in the corridor and wipes his face while the other officer follows Haynes and Miller off screen. Lister appears to speak on a radio, and an officer comes running down the hall. They both move off screen in the same direction as Haynes and Miller. A short while later, another officer comes running down the corridor and is seen speaking to Lister. Haynes is off screen for nearly two minutes before he and the entire group of officers are visible on Video One again. When they reappear, Haynes is being escorted down the corridor in handcuffs. His face appears injured, his shirt is torn, and his pants are around his ankles. Miller has a torn shirt.

Video Three depicts the incident from the opposite end of the corridor. Because of the distance, and the presence of a bridge across the corridor that blocks the scene, Video Three provides no clarity on the encounter. One can see at a distance when Haynes emerges from the cell and is taken to the ground, but once on the ground, he is behind a staircase. It is impossible to determine from this video what occurs while Haynes is behind the staircase. Video Two shows Haynes being escorted by officers through the quad after the incident is over, and Video Four shows Haynes being escorted into a shower. Defendants also submit two handheld videos, Videos 5.1 and 5.2, where an officer presents an explanation of what occurred while Haynes is showering in the background.

13

Video 5.1 shows that Haynes gets dressed and is taken to medical.  The Video also shows when Haynes is returned to a cell.  The officer finishes his report on Video 5.2.

## B. Haynes's Response & Evidence

Haynes maintains that there remain genuine issues of material fact that preclude summary judgment in Defendants' favor.  See Response at 2.  At the outset of his Response, Haynes incorporates his declaration where he sets out his version of the incident.  See Response at 1-3 (Haynes Decl.).  In Haynes's version of events, Defendants Burnham, Lister, and Miller walked to his cell and Burnham told him to "drop the case against Martin C.I. or I'm going to have you killed."  See Haynes Decl. ¶ 5.[9]  Haynes then asked Defendants to leave and Burnham responded by spraying chemical agent into Haynes's face "without any provocation."  Id.  According to Haynes, Defendant Miller punched him to the ground "inside his cell . . . ."  Id. ¶ 6.  Haynes asserts that he got up and attempted to run out of the cell but "was grab[bed] and slammed to the ground with his head bust[ed] open, and place[d] [in] handcuffs . . . ."  Id.  According to

---

[9] Haynes was involved in a use of force incident at Martin Correctional Institute on May 17, 2018.  In the Amended Complaint, Haynes identifies two lawsuits which relate to that incident, one filed in 2021 and the other in 2022.  See Haynes v. Martin Corr. Inst., Case No. 2:21-cv-14016-RAR, ECF No. 1 (S.D. Fla. filed Jan. 8, 2021) (complaint); Haynes v. Volpelletto, Case No. 2:22-cv-14006-WPD, ECF No. 1 (S.D. Fla. filed Jan. 5, 2022) (complaint); see also Am. Compl. at 10.

14

Haynes, he was not combative and did not resist or threaten the officers. Id. ¶¶ 6, 9. Instead, Haynes maintains that he "lay on the floor and tried to protect my face from the defendant's blows and kicks." Id. ¶ 9.

In his answers to Defendant's [sic] First Request for Interrogatories, Haynes describes the incident as follows:

> On May 16, 2019 at 11:33 AM at Hamilton C.I. I was inside my Dorm G1 cell 1115 when I was threaten[ed] by the Defendants to drop the case against Martin Correctional Institution. I ask[ed] the officers to leave my cell then I was sprayed with chemical agent [in] the face without any provocation then physical attack while handcuffed. I was punch[ed,] kick[ed,] and beat[en] with weapons.

See Motion, Ex. 1, Interrog. No. 4. Haynes provided a similar account in his deposition:

> At first I got sprayed, then punched. Then I tried to run out the cell, they grabbed me, slammed me to the ground. Head bus[ted] open. Then I got put in handcuffs. Then you know what I'm saying? They just kept beating me, beating me, beating me, kicking me, punching me, spraying me over and over and over. How can I get out the cell when I got officers inside my dorm, inside my cell.

See Motion, Ex. 2: Remote Deposition of Jeffrey Lorenzo Haynes (Doc. 48-2; Haynes Dep.) at 18-19. Notably, Haynes states that he could not see anything after he was sprayed with the chemical agent at the beginning of the encounter. Id. at 38-39.

15

During his deposition, Haynes repeatedly stated that he was handcuffed inside his cell.  Id. at 19-21.  Although he recalled trying to run out of his cell, he asserted that he did not succeed and instead was "pulled out" of the cell.  Id. at 18-21.   According to Haynes, once he was on the ground outside the cell, he "ball[ed] up."  Id. at 21-22.  Haynes testified that when he was on the ground, under the stairwell, "the attacks started, went on getting kicked, getting punched, getting sprayed until they decide to stop, you know."  Id. at 22.

Haynes has submitted medical records which document his injuries.  See Response, Ex. 1.  The records show that he sustained a laceration to his right eyebrow, an abrasion on the top right side of his head, an abrasion on his right cheek, an abrasion on his left cheek, and a laceration to his left ear.  See id., Ex. 1 at ECF p. 11.  His wounds were "slightly oozing blood" at the time of his examination.  Id., Ex. 1 at ECF p. 13.  Medical staff cleaned the wounds, and Haynes received four stitches to his right eyebrow.  Id., Ex. 1 at ECF pp. 8, 13.

## V. Applicable Law

### A. Eighth Amendment Excessive Force & Failure to Intervene

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987). However, it is well understood that prison guards, who are charged with maintaining order and security, may use

16

force when necessary to bring unruly inmates into compliance. Whitley v. Albers, 475 U.S. 312, 320-21 (1986); Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991).

In Sconiers v. Lockhart, 946 F.3d 1256, 1265 (11th Cir. 2020), the Eleventh Circuit reviewed "the principles applicable to Eighth Amendment excessive-force" claims:

> The Eighth Amendment, among other things, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as proscribed "cruel and unusual punishment." Hudson v. McMillian, 503 U.S. 1, 5 (1992). Nevertheless, the Supreme Court has instructed that what rises to the level of an "unnecessary and wanton infliction of pain" differs based on the type of Eighth Amendment violation alleged. Id.
>
> . . . "[T]he core judicial inquiry" requires [the Court] to consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 559 U.S. at 37.[10] This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both "acted with a sufficiently culpable state of mind" (the subjective element), and the conduct must have been "objectively harmful enough to establish a constitutional violation." Hudson, 503 U.S. at 8.

---

[10] Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

17

With respect to the subjective element, "to have a valid claim . . . the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-force violation, it focuses on whether the official's actions were "harmful enough," Hudson, 503 U.S. at 8, or "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991), to violate the Constitution. "Not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 37–38. Instead, the Eighth Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." Wilkins, 559 U.S. at 37.

Id. at 1265–66 (internal citations cleaned up).

Courts consider five distinct factors when determining whether an officer applied force maliciously and sadistically for the purpose of causing harm:

(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably

18

> perceived by the responsible officials on the basis of facts known to them.

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley, 475 U.S. at 321; Hudson, 503 U.S. at 7). Notably, a lack of serious injury, while not dispositive, is relevant to the inquiry:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[11] (quoting Whitley, supra, at 321, 106 S. Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[12]
>
> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38. Nevertheless, a prisoner's injuries or lack thereof may be "evidence of the kind or degree of force that was used by [an] officer."

---

[11] Hudson, 503 U.S. at 7.

[12] See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

19

Charles v. Johnson, 18 F.4th 686, 700 (11th Cir. 2021) (citing Crocker v. Beatty, 995 F.3d 1232, 1251 (11th Cir. 2021)).

In considering the Whitley factors, courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)). Moreover, corrections officials are not required to "convince every inmate that their orders are reasonable and well-thought out," and "[c]ertainly . . . are not required to do so where an inmate repeatedly fails to follow those orders." Danley v. Allen, 540 F.3d 1298, 1307 (11th Cir. 2008) overruled in part on other grounds as recognized by, Randall v. Scott, 610 F.3d 701 (11th Cir. 2010).  As such, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." Whitley, 475 U.S. at 322. A case should not go to the jury "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." Id.  Notably, the Eleventh Circuit has also stated "that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm,

20

that use satisfies the Eighth Amendment's objective harm requirement." Thomas, 614 F.3d at 1311 (citations omitted).

With respect to Haynes' duty to intervene claim, the law is well-established that a corrections officer has a duty to intervene when he witnesses a fellow officer's use of excessive force against an inmate and is in a position to intervene. See Helm v. Rainbow City, Ala., 989 F.3d 1265, 1272 (11th Cir. 2021) (citing Priester v. City of Riviera Beach, 208 F.3d 919, 924-27 (11th Cir. 2000)). "Of course, there also must be an underlying constitutional violation. Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed." Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019) (citations omitted). Nevertheless, a failure-to-intervene claim is "wholly dependent on the underlying excessive force claim." Id.

### B. Qualified Immunity

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338 F.3d 1259, 1266

21

(11th Cir. 2003) (citation omitted). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, an official bears the initial burden of establishing that his conduct fell within his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007). If the defendant does so, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the

22

right at issue was clearly established at the time of the defendant's alleged misconduct.") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009); Underwood, 11 F.4th at 1328.

Also, "[b]ecause § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is typically entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

## VI.   Analysis [13]

The Court begins its analysis with the need for the application of force.  In the Motion, Defendants maintain that they had a need to use force because Haynes "had begun to strike them and actively resisted their efforts to restrain him."  See Motion at 18.  Haynes denies striking the officers or resisting them

---

[13] For the purposes of resolving Defendants' Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Haynes. However, the Court notes that these facts may differ from those that ultimately can be proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

in any way.  In Haynes's version of events, Defendant Burnham sprayed him with a chemical agent "without any provocation."  See Haynes Decl. ¶ 5.  He maintains that he "did not resist or threaten" Defendants or "break any prison rules."  Id. ¶ 9.  Defendants invoke Heck[14] and contend that despite Haynes's testimony to the contrary, "the Court must accept that [Haynes] struck the officers and fought the officers in the cell," because "to do otherwise would imply the invalidity of" the Disciplinary Report.  See Motion at 16.

Upon review, the Court finds this argument to be well-taken.  Haynes is foreclosed from arguing that he was not resisting inside his cell or that he was subjected to the chemical agent without provocation because to do so would necessarily imply the invalidity of the disciplinary action.  See Dixon v. Hodges, 887 F.3d 1235, 1239-40 (11th Cir. 2018) (observing that a disciplinary punishment "of course" establishes that the plaintiff had lunged at the officer); Willingham v. Loughnan, 261 F.3d 1178, 1183 (11th Cir. 2001), vacated on other grounds, 537 U.S. 801 (2002), reinstated by, 321 F.3d 1299, 1304 (11th Cir. 2003); see also Cendan v. Trujillo, No. 16-21775-CIV-WILLIAMS/WHITE, 2018 WL 9540190, at *7 (S.D. Fla. Sept. 25, 2018); Anderson v. Tyus, No. 4:06-CV-

---

[14] Heck v. Humphrey, 512 U.S. 477 (1994).

24

004-SPM/WCS, 2007 WL 2884367, at *6 (N.D. Fla. Sept. 27, 2007). In light of Haynes's combative behavior and his refusal to submit to hand restraints, as established in the Disciplinary Report, the Court finds that there was a valid penological reason to use the chemical agent.[15]  See Danley, 540 F.3d at 1307-08 ("Pepper spray is an accepted non-lethal means of controlling unruly inmates.") overruled in part on other grounds as recognized by, Randall v. Scott, 610 F.3d 701 (11th Cir. 2010). Significantly, Haynes does not argue or present any evidence that Defendants prolonged the spray, exacerbated its effects in any way, or that he suffered any substantial or long-lasting injury from the spray. Indeed, the evidence shows that after Defendants gained control of Haynes, they escorted him to a shower. As such, the application of the chemical agent in response to Haynes's combative behavior does not constitute excessive force. See Danley, 540 F.3d at 1307 ("A short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders."); see also Thomas, 614 F.3d at 1310 ("[I]t is well-established that the

---

[15] Haynes maintains that Burnham sprayed the chemical agent. See Haynes Decl. ¶ 5; see also Am. Compl. ¶ 14. According to the Incident Reports, Officer Battles administered the spray. See Motion, Ex. 3 at ECF pp. 2, 4. The Court cannot resolve this disputed issue of fact, but regardless, the use of the chemical agent did not violate the Eighth Amendment.

use of chemical agents on recalcitrant prisoners is not per se unconstitutional . . . ." (collecting cases)).

This finding does not resolve the matter, however, because Haynes's excessive force claims extend beyond the use of the chemical agent. Indeed, the initial application of the chemical agent is merely one part of a larger incident during which, according to Haynes, Defendants beat and kicked him after he was on the ground and restrained. See Haynes Decl. ¶ 9; Interrog. No. 4; Haynes Dep. at 18, 22; see also Am. Compl. ¶¶ 19-20. Although Defendants maintain that no force was applied after Haynes was placed in restraints, see Incident Reports at ECF pp. 5, 7, 9, 10, the video evidence does not unequivocally establish what occurred when Haynes was on the ground behind the stairwell. Indeed, Defendants acknowledge that the events behind the stairwell are not shown on any of the video evidence. See Motion at 6-7 (acknowledging that the parties are under the stairwell "[f]or a considerable time" where it is "difficult to see" what occurs).[16]

---

[16] The video evidence does blatantly contradict Haynes's version of events in part. Haynes maintains that he was still inside his cell when he was punched, taken to the ground, and handcuffed, see Haynes Dep. at 18-20, while Video One unequivocally establishes that Haynes lunged out of his cell without hand restraints, and was punched, taken to the ground, and handcuffed outside of his cell. See Doc. 50: Video One. Thus, the Court does not credit Haynes's testimony that this happened inside his cell or that he was pulled out of the cell. See Haynes, 2024 WL 1911200, at *5-6. Nevertheless, the evidence rebutting Haynes's account of where certain events occurred does not so discredit his testimony as to warrant rejecting it

26

To the extent Defendants argue that Haynes's injuries demonstrate that "the use of force was proportional to the need," the Court is not persuaded that the limited extent of Haynes's injuries discredits his version of events. See Motion at 18. This is not a case where contemporaneous medical records completely undermine a plaintiff's claim that he was beaten. Cf. Steverson v. White, No. 3:14-cv-318-J-32PDB, 2017 WL 1155378, at *5-6 (M.D. Fla. Mar. 17, 2017) (granting summary judgment where plaintiff relied only his own declaration asserting that he was beaten but "contemporaneous medical records" showed "no injury or even complaint of injury"). Here, the medical assessment performed shortly after the alleged incident documents evidence of some trauma. See Response, Ex. 1. Thus, while Haynes's version of events may be exaggerated, the medical evidence is not such that the Court can wholly discredit his testimony at this stage in the proceedings. And if Haynes's version of events is accepted as true, the continued beating of a restrained inmate supports an excessive force claim despite the lack of serious injuries. See Wilkins, 559 U.S. at 38 ("An inmate who is gratuitously beaten by guards does

---

entirely, particularly given Haynes's testimony that he was unable to see after he was sprayed with the chemical agent. See Haynes Dep. at 38-39.

27

not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").

On the current record, absent video evidence, the Court is left with the parties' competing version of events. At this stage of the proceedings, the Court must accept Haynes's version as true. In his account, Defendants continued to beat and kick Haynes behind the stairwell after he was on the ground and restrained. Even accepting, as established in the Disciplinary Report, that Haynes was combative inside the cell, neither this behavior nor his breach of the cell door would justify the continued use of force once he was incapacitated. See Skrtich v. Thornton, 280 F.3d 1295, 1304 ("The use of force must stop when the need for it to maintain or restore discipline no longer exists."); Bowden v. Stokely, 576 F. App'x 951, 953 (11th Cir. 2014) ("[T]here would have been no need for the use of force, much less for the amount of force used, especially if, according to [the prisoner's] version, the use of force continued after he was handcuffed and being held down on his stomach."); Danley, 540 F.3d at 1309 ("When jailers continue to use substantial force against a prisoner who has clearly stopped resisting—whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated—that use of force is excessive."). This version of events, if credited by a jury, "is sufficient to support

28

an inference that [Defendants] gratuitously used force in violation of Haynes's constitutional rights." See Haynes, 2024 WL 1911200, at *7.

As such, whether the officers kicked and beat Haynes once he was on the ground and restrained is a genuine issue of material fact that must be resolved at trial. See Sears v. Roberts, 922 F.3d 1199, 1208 (11th Cir. 2019) ("[A] plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."). It is not the province of the Court on summary judgment to weigh the evidence or make credibility determinations. See Sconiers, 946 F.3d at 1263 ("Summary judgment is not a time for fact-finding; that task is reserved for trial."); Sears, 922 F.3d at 1208-09; see also Rivera v. LeBron, 824 F. App'x 838, 842 (11th Cir. 2020) ("As a general rule, that kind of credibility determination is not appropriate at the summary judgment stage."). Moreover, the Eighth Amendment right not to be subjected to excessive force has long been a clearly established right. See Skrtich, 280 F.3d at 1301 ("In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution."), overruled on

29

other grounds by <u>Pearson</u>, 555 U.S. 223. Thus, the Court concludes Defendants are not entitled to qualified immunity.  In light of the foregoing, Defendants' Motion is due to be denied.

Accordingly, it is

**ORDERED:**

1.    The Affidavit of Complainant (Doc. 54) is **STRICKEN**.

2.    Defendant's [sic] Motion for Summary Judgment (Doc. 48) is **DENIED**.  Plaintiff may proceed on his excessive force claims as limited in this Order.

3.    By **April 30, 2026**, the parties shall confer in good faith in an attempt to resolve this action.  If the parties reach a settlement, they shall promptly notify the Court.  If the parties cannot settle the claims privately, Defendants shall file a notice advising whether the parties believe a settlement conference with a United States Magistrate Judge will be beneficial.

**DONE AND ORDERED** in Jacksonville, Florida, this 30th day of March, 2026.

MARCIA MORALES HOWARD
United States District Judge

30

lc11
Copies to:

Jeffery Lorenzo Haynes, Jr.
Counsel of Record

31